**NORTON ROSE FULBRIGHT US LLP**
Thomas J. Hall
Howard S. Beltzer
Eric Daucher
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone: (212) 318-3000
Facsimile: (212) 408-5100

*Counsel for the Steering Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Application Pursuant to 28 U.S.C. § 1782 of <br><br> Coöperatieve Rabobank U.A.; Credit Agricole Corporate and Investment Bank; ING Bank N.V.; the International Finance Corporation; Natixis, New York Branch; and Nederlandse Financierings-Maatschappij Voor Ontwikkelingslanden N.V. <br><br> For an Order to Conduct Discovery for Use in Foreign Proceedings. | Case No. 20-mc-89 |

**MEMORANDUM OF LAW IN SUPPORT OF STEERING COMMITTEE'S *EX PARTE*
APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

# TABLE OF CONTENTS

Preliminary Statement ........................................................................................................... 1

Background ............................................................................................................................ 3

    I.       The Nature of Vicentin's Business ................................................................ 3

    II.     The Steering Committee's Involvement with Vicentin .......................... 5

    III.    Vicentin's Abrupt Collapse and Vanishing Value ................................. 6

Nature of Evidence Sought and Relief Requested ...................................................... 11

Argument ............................................................................................................................ 12

    I.       Standard for Granting Relief ..................................................................... 12

    II.     The Steering Committee's Application Meets all of the Statutory Requirements for Discovery Pursuant to 28 U.S.C. §1782 ......................................................... 13

        A.       The Discovery Targets Reside or Can be Found in this District ............. 13

        B.       The Discovery Sought is for Use in a Proceeding Before a Foreign Tribunal ................................................................................................................... 17

        C.       The Members of the Steering Committee are "Interested Parties" for Purposes of 28 U.S.C. § 1782 ........................................................................... 19

    III.    The Relevant Discretionary Factors also Weigh in Favor of Granting Discovery 19

Conclusion .......................................................................................................................... 21

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991) ......................................15

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76 (2d Cir. 2012) ...................13, 16

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 37 S. Ct. 1773 (2017) ....................................14

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113
(2d. Cir. 2015)........................................................................................................................... 17

*Deposit Ins. Agency v. Leontiev*, No. 17-MC-00414 (GBD)(SN) 2018 WL 3536083
(S.D.N.Y. July 23, 2018) ......................................................................................................... 16

*Gushlak v. Gushlak*, 486 F. App'x 215 (2d Cir. 2012)...................................................................1

*In re Application of Fernando Celso De Aquino Chad*, No. 19MC261 2019 WL 2502060
(S.D.N.Y. June 27, 2019)...........................................................................................................20

*In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ),
2006 WL 3844464 (S.D.N.Y. Dec. 29, 2006) ..........................................................................13

*In re Application of Maria Ester Tabak*, No. 18-mc-00221 (PGG) (S.D.N.Y. July 1, 2018) ...... 19

*In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019) ................................................................. 13, 14

*In re Edelman*, 295 F.3d 171 (2d Cir. 2002)................................................................................ 13

*In re Godfrey*, 526 F. Supp. 2d 417 (S.D.N.Y. 2007)................................................................... 13

*In re Hornbeam Corp.*, 722 F. App'x 7 (2d Cir. 2018) ................................................................ 18

*In re Sargeant*, 278 F. Supp. 3d 814 (S.D.N.Y. 2017) ................................................................ 18

*In re Top Matrix Holdings Ltd.*, No. 18 MISC. 465 (ER), 2020 WL 248716
(S.D.N.Y. Jan. 16, 2020)..................................................................................................... 17, 18

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241  (2004) .................................... passim

*Lancaster Factoring Co. v. Mangone*, 90 F.3d 38 (2d Cir. 1996)......................................... 17, 18

*Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6 (2d Cir. 2014)....................... 12

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129 (2014)............... 15

*Mees v Buiter*, 793 F.3d 291 (2d Cir. 2015) ................................................................................ 12

*Optimal Inv. Servs., S.A. v. Berlamont*, 773 F.3d 456 (2d Cir. 2014)..................................... 12, 19

**<u>Statutes</u>**

28 U.S.C. § 1782 .................................................................................................................. 12, 13

Coöperatieve Rabobank U.A. ("Rabobank"); Credit Agricole Corporate and Investment Bank ("CACIB"); ING Bank N.V. ("ING"); the International Finance Corporation ("IFC"); Natixis, New York Branch ("Natixis"); and Nederlandse Financierings-Maatschappij Voor Ontwikkelingslanden N.V. ("FMO" and, collectively with Rabobank, CACIB, ING, IFC, and Natixis, the "Steering Committee") respectfully submit this memorandum of law in support of their *ex parte* application (the "Application") for an Order, pursuant to 28 U.S.C. § 1782 ("Section 1782"), for leave to serve The Clearing House Payments Company L.L.C. (the "Clearing House") and a number of financial institutions (collectively with the Clearing House, the "Discovery Targets") listed on Exhibit A to the Declaration of Guillermo Jorge submitted contemporaneously herewith (the "Jorge Declaration") that regularly act as intermediary or correspondent banks with respect to US dollar-denominated transactions, with subpoenas in connection with an in-court restructuring proceeding (*concurso preventivo*) initiated by Vicentin S.A.I.C. ("Vicentin" or the "Company") before an Argentine court and other proceedings that are contemplated to be commenced in the near future before courts located in Argentina in respect of Vicentin and certain of its affiliated entities and/or individuals.[1]

## PRELIMINARY STATEMENT

The Steering Committee seeks this Court's assistance in obtaining financial records that are uniquely available in this District, and which are necessary to get to the truth of a situation that bears all of the hallmarks of major international financial impropriety. The Steering Committee is

---

[1] District courts may, and indeed typically do, grant relief under Section 1782 on an *ex parte* basis. *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 ex parte. The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash [a subpoena] pursuant to Federal Rule of Civil Procedure 45(c)(3).").

a group of financial institutions that are collectively owed approximately US$500 million by Vicentin, a large Argentinian agribusiness.  Until very recently, Vicentin was producing financial records that reflected robust performance and financial health: ample reserves of raw materials and finished goods, positive cash flow from operating activities, minimal trade payables, and hundreds of millions of dollars of equity value.  Then, in December 2019, and without prior warning, Vicentin collapsed, shutting down its operations.  In doing so, Vicentin revealed that it not only lacked the ample reserves it had previously declared, but actually owed approximately US$350 million to its suppliers—*i.e.*, local farmers and grain traders.

It is presently unclear what caused Vicentin's abrupt failure.  Were the Company's accounts overstated all along?  Was it improperly stripped of assets?  The Steering Committee does not yet know because the Company has failed to provide the required information.  But critically, Vicentin's major transactions—like its debt—were dollar-denominated, meaning that they often physically cleared through banks in this District.  Enforcement proceedings against Vicentin, as well as an in-court restructuring proceeding commenced by Vicentin, are already afoot in Argentina.  The Steering Committee requests this Court's assistance in obtaining the financial transaction records that will be critical to guiding those proceedings to a successful and appropriate conclusion.

## BACKGROUND[2]

### I.      The Nature of Vicentin's Business

Vicentin is a large, family-owned Argentine business founded in 1929.  Until very recently, Vicentin operated one of Argentina's largest agro-industrial businesses, with significant activities in the agriculture, agricultural products, and textiles fields.[3]

The Company has frequently been described as a "major player" in the Argentinian soy market—an area in which it has been active since the 1970s.  The Company managed four major soybean crushing facilities in Argentina—Renova (crushing capacity of approximately 9,000 tons per day), Ricardone (crushing capacity of approximately 4,350 tons per day), and two plants at San Lorenzo (combined crushing capacity of approximately 16,650 tons per day)—making the company one of the largest oilseed crushers in the country as measured by capacity.  Vicentin's overall share of the crushing market in Argentina—which itself accounts for approximately 17% of the total global soybean crushing capacity—was substantial, and typically ranged between 11% and 15%.

In addition, Vicentin managed two port terminals in Argentina's Great Rosario Area, where the overwhelming majority of Argentina's soybean production (approximately 93%) and soybean crushing (approximately 95%) takes place.

In 2007, the Company also opened biodiesel plants in Argentina, and thereafter became one of the main participants in Argentina's biodiesel sector.  Thereafter, Vicentin continued to

---

[2]    Support for the factual statements set forth in this background section is contained in the Jorge Declaration, including the Exhibits thereto.

[3]    Vicentin is currently not operating, and therefore will generally be referred to herein in the past tense, although its future remains in question.

expand its agricultural product offerings, adding refined glycerin and ethanol production capabilities at its Renova and Avellaneda facilities.

Vicentin's apparent "crown jewel" asset was a 50% interest (33% directly held and 16.67% through its subsidiary, Vicentin Paraguay S.A.) in Renova S.A. ("Renova"), a 50-50 joint venture with Oleaginosa Moreno S.A., a wholly-owned indirect subsidiary of Switzerland-based Glencore plc ("Glencore").  Begun in 2006 with an agreement to construct Argentina's first biodiesel from soybean oil plant, Renova expanded over time to become one of the most efficient oilseed crushers in the world, coupled with one of the largest biodiesel production facilities in Argentina, an integrated 30 megawatt co-generation plant, and its own port facilities.  In 2017, Renova began to expand still further with the construction of a new grain port, a barge terminal, and additional storage capacity.

The overwhelming majority of Vicentin's sales were exports.  For example, Vicentin reported that, in 2018, approximately 87.3% of Vicentin's revenues were derived from exports.[4] In its third quarter 2019 financial statements, Vicentin reported that approximately 91.8% of its revenues were derived from exports.[5]  Those transactions were primarily denominated in US dollars and, as a result, the Company has treated US dollars as its functional currency.[6]

In sum, Vicentin was, by any measure, a major Argentine agribusiness enterprise engaged in substantial dollar-denominated sales.

---

[4]   *See* Jorge Declaration Exhibit L.

[5]   *See* Jorge Declaration Exhibit I at 21, n. 20.

[6]   *See* Jorge Declaration Exhibit I at 2, n. 4.

**II.**    **The Steering Committee's Involvement with Vicentin**

Consistent with industry practice, Vicentin traditionally financed its substantial working capital needs through short-term renewable credit lines.  Credit was traditionally extended to Vicentin by a wide range of both local and international banks and financial institutions.

The Steering Committee is Vicentin's largest creditor constituency, and consists of international financial institutions that are collectively owed, either directly as lender of record or indirectly as loan participants, approximately US$500 million by Vicentin.  These loans were extended through a number of different facilities (collectively, the "SteerCo Facilities").  The principal SteerCo Facilities are as follows:

- *The "IFC A/B Facility":*  An approximately US$292.5 million principal amount facility, divided into an A-tranche (US$35 million), B-1 tranche (US$185.5 million), and B-2 tranche (approximately US$72 million), all of which are secured by Vicentin's receivables under certain "Eligible Export Contracts" relating to its crushing operations.  IFC is the lender of record under the IFC A/B Facility, while Natixis acts as collateral agent.[7]  Approximately US$265.5 million principal is currently outstanding under the IFC A/B Facility.

- *The "FMO A/B Facility":*  A US$150 million pre-export finance term loan facility, divided into an A-facility (US$45 million) and a B-facility (US$105 million).  FMO acts as agent for the FMO A/B Facility, while Natixis acts as collateral and security agent.   Approximately US$150 million remains outstanding under the FMO A/B Facility.[8]

- *The "ING Facility":*  A pre-export finance facility, with a maximum committed availability of US$115 million.  ING acts as facility agent, security agent, and sole coordinator.   Approximately US$71.9 million is currently outstanding under the ING Facility.[9]

- *The "Natixis Facility":*  An uncommitted pre-export finance facility, with a maximum facility amount of US$30 million.  Natixis acts as the bank under the

---

[7]    *See* Jorge Declaration Exhibit C.

[8]    *See* Jorge Declaration Exhibit D.

[9]    *See* Jorge Declaration Exhibit E.

Natixis facility.  Approximately US$10 million is currently outstanding under the Natixis Facility.[10]

- ***The "Rabobank Facilities":*** Two uncommitted pre-export finance facilities, with a combined maximum facility amount of US$23 million.  Rabobank acts as the lender under the Rabobank Facilities.  Approximately US$23 million is currently outstanding under the Rabobank Facilities.[11]

**III.    Vicentin's Abrupt Collapse and Vanishing Value**

As is customary with financings of their size, the SteerCo Facilities contained various covenants that Vicentin was obligated to comply with, as well as various financial reporting requirements that Vicentin was obligated to meet in order to demonstrate its covenant compliance. For example, pursuant to Section 5.03(a) of the agreement governing the IFC A/B Facility, Vicentin was required to:

> As soon as available but in any event within 60 days after the end of each Financial Quarter other than any Financial Quarter ending October 31 (or in the case of the Financial Quarter ending January 31, 120 days), deliver to IFC:
>
> (i) the Borrower's complete financial statements for such quarter prepared, on a Consolidated Basis, in accordance with the Accounting Standards and on a basis consistent with the Borrower's audited financial statements, in each case, certified by the Borrower's chief financial officer; and
>
> (ii) a report (in a form pre-agreed by IFC), signed by the Borrower's chief executive officer, chief financial officer or any 2 members of the Board or 1 member of the Board and 1 attorney in fact, concerning compliance with the financial covenants in this Agreement….[12]

Vicentin was likewise obligated to notify the members of the Steering Committee of any actual or potential events of default under its loan documents (including actual or potential

---

[10]    *See* Jorge Declaration Exhibit F.

[11]    *See* Jorge Declaration Exhibits G and H.

[12]    *See* Jorge Declaration Exhibit C § 5.03(a).

breaches of its financial covenants)[13] as well as any anticipated changes to Vicentin's business or operations that could reasonably be expected to have a material adverse effect.[14]

Until very recently, Vicentin reported robust financial performance to members of the Steering Committee.  For example, as recently as in its July 31, 2019 consolidated financial statements, Vicentin reported to its lenders, including members of the Steering Committee, that the Company was on sound financial footing.[15]  Among other things, Vicentin reported:

- Total non-current assets (e.g., property, plant and equipment, as well as certain investments in joint ventures and associated entities) of more than US$700 million;[16]

- Total current assets (e.g., inventories, trade receivables, other receivables, cash, and cash equivalents) of more than US$1.1 billion;[17]

- Total equity (in excess of reported liabilities) of more than US$600 million;[18] and

- Positive cash flow from operating activities, resulting in a profit of millions of dollars in the preceding quarter for the Company's controlling shareholders.[19]

Moreover, the Company reported only minimal non-current trade and other payables, consisting of a mere US$675,000 in respect of external client advances.[20]  Current payables to its

---

[13]   *See, e.g.,* Jorge Declaration Exhibit C § 5.03(i).

[14]   *See, e.g.,* Jorge Declaration Exhibit C § 5.03(g).

[15]   In preparing and submitting its unaudited financials, the Company expressly noted that "[t]hese consolidated financial statement [sic] are issued to be used by financial institutions, in particular by [FMO], [Rabobank], [IFC], Amerra Capital Management, LLC., [ING], Sumitomo Mitsui Banking Corporation and The Bank of Tokyo – Mitsubishi UFJ. LTD. [(n/k/a MUFG Bank, Ltd.)], in compliance with the financing agreements entered into with them."  *See* Jorge Declaration Exhibit I, at n. 3.

[16]   *See* Jorge Declaration Exhibit I.

[17]   *See* Jorge Declaration Exhibit I.

[18]   *See* Jorge Declaration Exhibit I.

[19]   *See* Jorge Declaration Exhibit I.

[20]   *See* Jorge Declaration Exhibit I. at 19, n. 18.

raw material suppliers were likewise relatively low in the context of an enterprise of Vicentin's scope—only slightly more than US$10 million was reported to be owed to suppliers of raw materials.[21]   Indeed, Vicentin specifically reported that "the Company complied with all the covenants established in the long-term loan agreements" referenced in the financial statements.[22]

Between releasing its July 31, 2019 financial statements, when it reported a strong balance sheet, minimal outstanding trade payables, and full covenant compliance, and December 2019, Vicentin failed to advise the members of the Steering Committee of any change in the Company's financial position.

Then, on December 5, 2019, without warning to its lenders, Vicentin publicly announced that it was "under financial stress."   Public information revealed that, in addition to its acknowledged financial indebtedness, the Company had accumulated approximately *US$350 million* in overdue payments owed to its suppliers.  As a result of this arrearage, suppliers evidently ceased shipping any raw material grains to the Company, forcing a halt to operations. Subsequently, on December 13, 2019, Vicentin suspended its crushing operations pending debt restructuring talks.

Moreover, although various covenants in the SteerCo Facilities prohibited Vicentin and its subsidiaries from selling assets other than in the ordinary course of business (subject to certain limited, and inapplicable, exceptions for transactions under US$5 million),[23] public information revealed that, mere days before Vicentin halted operations, the Company sold a 16.67% stake (indirectly held through Vicentin Paraguay S.A.) in Renova to Glencore in an effort to raise cash.

---

[21]   *See* Jorge Declaration Exhibit I. at 19, n. 18.

[22]   *See* Jorge Declaration Exhibit I at 18, n. 17(a).

[23]   *See, e.g.,* Jorge Declaration Exhibit C § 5.02(r).

As a result of that impermissible transaction, Vicentin's stake in Renova (directly and indirectly) was reduced to approximately 1/3 ownership, while Glencore's ownership interest increased to approximately 2/3.  It appears that Vicentin received over US$122 million from the transaction, but it is unclear what became of the majority of the sale proceeds.

In response to these events, the Steering Committee was organized and members of the Steering Committee took steps to formally declare events of default under the SteerCo Facilities and to accelerate payment on the balance of the SteerCo Facilities.

Following its organization, the Steering Committee has repeatedly contacted the Company and its advisors in an attempt to initiate a dialogue.[24]

In particular, the members of the Steering Committee are eager to understand how, exactly, the Company went—in a matter of months—from reporting to the lenders that it was flush with cash, inventory, and receivables to declaring that it was without inventory or receivables, that it was, to the contrary, massively in arrears on inventory payables and unable to continue operations. Simply put, the lenders need to know how hundreds of millions of dollars—and possibly more than a billion dollars—of assets vanished.  Were the July 29, 2019 financials submitted to the banks for covenant compliance purposes inaccurate and the inventories greatly overstated or the account payables greatly understated?  Was cash improperly diverted from the business?  Was inventory improperly exported from Argentina by nominees acting on behalf of Vicentin, its management, or its owners?  Was it a combination of these factors, or something else entirely?  So far, the Steering Committee does not know because the Company has refused to provide information as to how its assets were seemingly dissipated.

---

[24]   *See* Jorge Declaration Exhibit J.

Moreover, Argentine court records, as well as publicly available information, indicate that various creditors have begun seeking enforcement or protective measures.

Of greater concern, there are also reports that a criminal complaint has been filed against, among others, several Vicentin executives with respect to the Company's recent conduct, but it remains to be determined whether any action will be taken on that complaint.

Finally, on or about February 6, 2020, one of the Company's trade creditors submitted a *quiebra* request—a type of involuntary bankruptcy proceeding—against Vicentin in Argentina. Although that proceeding was initially commenced in the incorrect court, it was in the process of being transferred to the proper court. Once that transfer was completed, Vicentin would have had only a matter of days either to obtain dismissal of the proceeding or to commence its *concurso preventivo*, which is a type of in-court restructuring process.

On February 10, 2020, Vicentin formally commenced its *concurso preventivo* before the Civil and Commercial Court N° 4 of the City of Reconquista, Santa Fe Province, Argentina.[25] Reconquista is a small jurisdiction (around 100,000 inhabitants) where Vicentin has always played a crucial economic role. Courts in Reconquista are rarely confronted with complex economic and financial issues.

A *concurso preventivo* proceeding allows a company to prevent its involuntary bankruptcy and to seek an agreement with its creditors. While the court will appoint an administrator (*síndico*) and a creditor's committee, the management of the company remains in place. The evidence sought through the Application will help the Steering Committee to enforce its creditor's rights in the *concurso preventivo*. For instance,

---

[25]   *See* Jorge Declaration Exhibit M.

Vicentin is required by law to explain the events that lead to its current financial distress and make all its books and financial records available to the creditors. The evidence sought through the Application will allow the Steering Committee to examine the accuracy of Vicentin's financial statements, challenge them in court, and seek appropriate remedies and protections.

### NATURE OF EVIDENCE SOUGHT AND RELIEF REQUESTED

As set forth with more specificity in the sample subpoenas attached to the Application as Exhibits A and B, the Steering Committee seeks evidence of wire transfers naming Vicentin, certain Vicentin subsidiaries, and certain individuals known to own and/or control Vicentin. The identity of the Vicentin-affiliated entities and individuals as to which information is sought, as well as their particular relationships to Vicentin, are set forth with specificity on Exhibit B to the Jorge Declaration. The Discovery Targets are financial institutions that act as intermediaries in processing such wire transfers in this District.

As set forth above, the Vicentin corporate structure and the limited financial records that Vicentin has thus far made public indicate that either (a) Vicentin provided substantially inaccurate information concerning its financial condition to the Steering Committee in order to demonstrate its purported compliance with various financial covenants and/or (b) substantial working capital assets—in the range of hundreds of millions of US dollars—were improperly siphoned from the Company in the latter half of 2019 after the Company last delivered financial statements to members of the Steering Committee. The evidence sought through the Application is crucial to uncovering the amount and location of funds held or otherwise transferred through intermediary financial institutions by Vicentin and its affiliated entities and individuals.

## ARGUMENT

### I.  Standard for Granting Relief

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004). Section 1782 "provide[s] for assistance in obtaining documentary and other tangible evidence as well as testimony." *Id.* at 248. The statute provides, in relevant part, that:

> [t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a).

Courts considering requests for relief under Section 1782 have recognized that the statute contains threshold mandatory requirements for obtaining relief, as well as discretionary elements. First, with respect to the mandatory requirements:

> A district court is authorized to grant a § 1782 request where: (1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a foreign or international tribunal, and (3) the application is made by a foreign or international tribunal or any interested person.

*Mees v Buiter*, 793 F.3d 291, 297 (2d Cir. 2015); *Optimal Inv. Servs., S.A. v. Berlamont*, 773 F.3d 456, 460 (2d Cir. 2014); *Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 F. App'x 6, 8 (2d Cir. 2014).

Once it has been established that an application meets the mandatory requirements for granting discovery, the district court has discretion as to whether and, to what extent, to approve the request.  *See Mees*, 793 F.3d at 297.  The Supreme Court has provided guidance as to the factors that should be considered by a court in deciding how to exercise its discretion:

- Discovery is more likely to be appropriate where the discovery target is ***not*** a party to the foreign proceeding;

- The court may consider the character of the foreign proceedings and whether the foreign tribunal would be receptive to assistance from U.S. federal courts;

- Discovery may be inappropriate if the Section 1782 request "conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States"; and

- "unduly intrusive or burdensome requests may be rejected or trimmed."

*Intel*, 542 U.S. at 264-65; *see also Mees*, 793 F.3d at 298 (reciting four factors).

In this instance, discovery should be awarded because the Steering Committee's Application satisfies each of the mandatory requirements and is also supported by the discretionary factors.

## II.     The Steering Committee's Application Meets all of the Statutory Requirements for Discovery Pursuant to 28 U.S.C. § 1782

### A.     The Discovery Targets Reside or Can be Found in this District

In order to be subject to discovery under Section 1782, an entity must either reside or be found in the District.  *See* 28 U.S.C. § 1782.  In determining whether that standard is met, the Second Circuit has emphasized that "[c]ourts have consistently given broad interpretations to similar 'found' language in other statutes."  *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019).  Moreover, the Second Circuit has "repeatedly recognized Congress's intent that § 1782 be 'interpreted broadly….'"  *Id.* (citing *In re Edelman*, 295 F.3d 171, 180 (2d Cir. 2002); *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)).  Accordingly, the

requirement that a party "resides or is found" in a District in order to be subject to discovery under Section 1782 is given maximum possible breadth, and "extends to the limits of personal jurisdiction consistent with due process." *In re del Valle Ruiz*, 939 F.3d at 528.

At a minimum, a legal entity resides or is found in a jurisdiction when it is headquartered or incorporated there—meaning that it is subject to general personal jurisdiction in that District. *See, e.g., In re Godfrey,* 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007); *In re Application of Gemeinschaftspraxis Dr. Med. Schottdorf,* No. Civ. M19-88 (BSJ), 2006 WL 3844464, at *4 (S.D.N.Y. Dec. 29, 2006) ("McKinsey maintains its headquarters in New York, and thus is 'found' within this district").

However, in emphasizing the breadth of Section 1782's availability, the Second Circuit recently expressly rejected the contention that an entity is ***only*** found in a District if it is incorporated or headquartered there. *See In re del Valle Ruiz*, 939 F.3d at 527 ("[O]ur focus on tag jurisdiction comporting with due process in no way suggests that § 1782's reach should be coextensive only with the limits of a district court's general jurisdiction.").  To the contrary, Section 1782 discovery can likewise be founded on specific personal jurisdiction.  *See id.* at 528-29.  "For specific jurisdiction, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State."  *Id.* at 529 (*quoting Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) (internal quotation marks omitted).

In this instance, the Clearing House and all of the other Discovery Targets are subject to either this Court's general or specific personal jurisdiction.  The first Discovery Target, the Clearing House, is subject to this Court's general personal jurisdiction, and is thus found in this District for purposes of Section 1782, because it maintains its headquarters at 1114 Avenue of the

Americas, 17th Floor, New York, NY 100036.  A number of the other Discovery Targets—all of which are large banks or similar financial institutions—are likewise headquartered in this District. Complete details of the locations of the Discovery Targets' respective headquarters are set forth on Exhibit A to the Jorge Declaration.

The remainder of the Discovery Targets are "found" in this District for purposes of Section 1782 because they are subject to this Court's specific personal jurisdiction.  As an initial matter, each of the Discovery Targets has purposefully availed themselves of this forum by maintaining one or more branches in this District.  *See* Jorge Declaration Exhibit A.

More important for purposes of the Application, however, each of the Discovery Targets consistently transacts business in this District by acting as an intermediary or correspondent bank in connection with US dollar-denominated transactions.  As a matter of the structure of the international financial system, these intermediary transactions generally clear through this District. In particular, each of the Discovery Targets (with the exceptions of the Clearing House itself and Itau Unibanco S.A., New York Branch) is one of the very few institutions worldwide that has taken the necessary steps to become a direct participant in the Clearing House Interbank Payments System ("CHIPS").  CHIPS is operated by the Clearing House through this District, and is the largest private sector US dollar clearing system in the world, clearing and settling approximately US$1.5 trillion in domestic and international payments per day.  All transfers processed through CHIPS clear through this District, where CHIPS is located.  As New York courts have explained:

> Wholesale wire transfers are generally made over the two principal wire payment systems: the Federal Reserve Wire Transfer Network (Fedwire) and the CHIPS.  The CHIPS network handles 95% of the international transfers made in dollars…. These funds are transferred through participating banks located in New York…. As a result, this State is considered the national and international center for wholesale wire transfers.

*Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991) (internal citations omitted); *see also Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129, 137 (2014) ("Indeed, the parties here agree that, as a practical matter, any dollar transaction comparable in size to the one now at issue must go through New York.").

This is critical because the overwhelming majority of Vicentin's revenues—more than 90% based on the most recently available figures—were derived from dollar-denominated exports. *See* Jorge Declaration ¶ 18. Indeed, the Company has expressly treated US dollars as its functional currency. *See id.* Consequently, a large portion of Vicentin's transactions will have been processed in this District by institutions such as the Discovery Targets. The information sought by the Steering Committee through the Application relates directly to the business transacted by each of the Discovery Targets in this district—records of transfers denominated in US dollars that cleared through CHIPS, its public sector counterpart (Fedwire), or similar systems. Indeed, the Steering Committee has already been able to confirm that Vicentin maintains accounts at certain of these Discovery Targets, such as JP Morgan Chase NA, and has used others, such as MUFG Bank, Ltd. as a correspondent bank in this District. *See* Jorge Declaration ¶ 18.

Finally, this Court has personal jurisdiction with respect to Itau Unibanco S.A., New York Branch because: (a) Itau Unibanco S.A., New York Branch is, as its name suggests, physically located in New York;[26] (b) Vicentin and certain of its affiliates are known to maintain accounts with it in this District;[27] (c) Vicentin and certain of its affiliates are known to have received substantial wires through that Itau Unibanco S.A., New York Branch account, including certain

---

[26] *See* Jorge Declaration Exhibit A.

[27] *See* Jorge Declaration ¶ 18.

funding wires in respect of the SteerCo Facilities; and (d) the information sought by the Application relates specifically to such wire transfer records.

Accordingly, the first mandatory requirement for the approval of discovery under Section 1782 is satisfied.

B.     The Discovery Sought is for Use in a Proceeding Before a Foreign Tribunal

Courts in this District have repeatedly affirmed that "[w]hether discovery is 'for use in a foreign proceeding' is afforded broad interpretation." *Deposit Ins. Agency v. Leontiev*, No. 17-MC-00414 (GBD)(SN), 2018 WL 3536083, at *3 (S.D.N.Y. July 23, 2018). An applicant need not show that the material would be admissible in a particular foreign proceeding. *See Brandi–Dohrn*, 673 F.3d at 82. To the contrary, the foreign proceeding need not even yet be under way, so long as it is "within reasonable contemplation." *Intel*, 542 U.S. at 259. An action is within reasonable contemplation if there is "'some objective indicium' or 'some concrete basis' of petitioners' intent to initiate a foreign proceeding." *In re Top Matrix Holdings Ltd.,* No. 18 MISC. 465 (ER), 2020 WL 248716, at *4 (S.D.N.Y. Jan. 16, 2020) (quoting *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123–24 (2d. Cir. 2015)).

At a minimum, the Steering Committee anticipates using the information sought through the Application in connection with Vicentin's already-commenced *concurso preventivo* proceedings. *See* Jorge Declaration ¶¶ 31, 38. As described in further detail in the Jorge Declaration, a *concurso preventivo* is an Argentinian in-court insolvency and restructuring proceeding. *See id.* ¶ 31. Such restructuring proceedings satisfy Section 1782's foreign proceeding requirement. *See Lancaster Factoring Co. v. Mangone*, 90 F.3d 38, 42 (2d Cir. 1996) ("A bankruptcy proceeding . . . is within the intended scope of § 1782."). Indeed, the information sought by the Steering Committee, which consists entirely of financial records that will allow

creditors to trace Vicentin's dissipated assets, will be enormously helpful in those *concurso preventivo* proceedings.  *See* Jorge Declaration ¶ 32.

Moreover, additional foreign proceedings are within reasonable contemplation.  The Steering Committee intends to take action in Argentina to hold accountable Vicentin and any other parties that were responsible for, or benefitted from, the dissipation or improper overstatement of Vicentin's assets.  *See* Jorge Declaration ¶ 39.  That contemplated action meets the statutory requirement, which only requires that a party seeking discovery "present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye."  *Certain Funds, Accounts and/or Inv. Vehicles Managed by Affiliates of Fortress Inv. Group*, 798 F.3d at 124.

As an initial matter, "sworn statements attesting to petitioners' intent to litigate and describing the legal theories on which they plan to rely are sufficiently concrete to meet the statutory requirement."  *In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *4 (*citing In re Hornbeam Corp.*, 722 F. App'x 7, 9–10 (2d Cir. 2018)).  Moreover, the already developed facts provide sufficiently concrete support for impending litigation.  There is no question that, as of July 31, 2019, the Company represented to members of the Steering Committee that it had ample working capital assets, positive cash flow, was in compliance with its loan covenants, and, perhaps most critically, had minimal outstanding debt to its trade creditors (approximately US$11 million to raw material suppliers).  And there is no question that, as of December 2019, the Company abruptly shut down, indicated that it had no material working capital assets, and had been struggling for so long that it accumulated approximately ***US$350 million*** in supplier arrearages in addition to its financial debt.  It is clear that there was hundreds of millions of dollars of wrongdoing here—the requested discovery is simply needed to prove exactly where the money

18

went.  *See In re Sargeant*, 278 F. Supp. 3d 814, 822 (S.D.N.Y. 2017) (holding that discovery sought to trace assets likely satisfied the second requirement).  Accordingly, the second mandatory requirement is satisfied.

      C.      The Members of the Steering Committee are
                  "Interested Parties" for Purposes of 28 U.S.C. § 1782

A person who has a "participation right" and "possesses a reasonable interest in obtaining judicial assistance . . . qualifies as an interest person within any fair construction of that term." *Intel*, 542 U.S. at 256-57 (internal citations omitted).  Moreover, the "legislative history to § 1782 makes plain that 'interested person' includes a party to the foreign litigation." *Lancaster*, 90 F.3d at 42 (internal citations omitted).

As a matter of Argentine law, the members of the Steering Committee have full participation rights in Vicentin's *concurso preventivo* proceedings, with standing to be heard, submit objections, vote on any proposed restructuring, and take similar actions.  *See* Jorge Declaration ¶ 40.  In addition, as Vicentin's largest creditor constituency, the members of the Steering Committee have standing to seek enforcement of their rights under the SteerCo Facilities against Vicentin and other parties that may have participated in the apparent dissipation of Vicentin's assets.  *See id.* ¶ 40.  Accordingly, the Application satisfies the third mandatory requirement for approval of discovery under Section 1782.

**III.**    **The Relevant Discretionary Factors also Weigh in Favor of Granting Discovery**

As noted above, once the District Court has determined that the mandatory requirements for relief under Section 1782 are met, the Court is free to grant discovery in its discretion. *Optimal Inv. Servs., S.A.*, 773 F.3d at 460.  Here, the Court should award discovery because all of the discretionary factors likewise support discovery.

First, none of the Discovery Targets are parties to, or are anticipated to be parties to, any of the contemplated proceedings in Argentina. *See* Jorge Declaration ¶ 43. To the contrary, the Discovery Targets are simply international financial institutions that, to the Steering Committee's knowledge, had no role in any wrongdoing by Vicentin beyond potentially engaging in routine processing of US dollar-denominated transfers. Accordingly, the first factor weighs in favor of granting the Application. *See Intel*, 542 U.S. at 264 ("[T]he need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

Second, the Steering Committee's Argentine counsel has advised that the Argentine Court would likely be receptive to any information uncovered through discovery as to the transfers made by Vicentin and its affiliated entities and individuals. *See* Jorge Declaration ¶ 44. Indeed, courts in this District have, on multiple occasions, approved similar intermediary bank discovery under Section 1782 in order to make such information available to Argentine courts. *See, e.g., In re Application of Maria Ester Tabak*, No. 18-mc-00221 (PGG) (S.D.N.Y. July 1, 2018) ("[T]here is no indication that the Argentine court would not be receptive to U.S. federal-court judicial assistance as requested in the Application").

Third, the Application does not circumvent any existing or anticipated evidence gathering restrictions imposed in Argentina. The Steering Committee's Argentine counsel has advised that the evidence sought through the Application would likely be admissible in an Argentine court overseeing Vicentin's *concurso preventivo* proceeding or other litigation against Vicentin and its affiliated entities or individuals. *See* Jorge Declaration ¶ 45.

Finally, the Application is not unduly intrusive or burdensome. The proposed requests to the Discovery Targets, as reflected in the sample subpoenas attached to the Application as Exhibit

A and B, are limited to the type of information that the Discovery Targets regularly maintain and produce to third parties or actual partial in litigation. *See* Jorge Declaration ¶ 46. Courts in this District have recognized that similar requests to intermediary banks and the Clearing House impose only a "minimal burden" and have accordingly approved discovery. *See, e.g, In re Application of Fernando Celso De Aquino Chad*, No. 19-mc-261, 2019 WL 2502060, at *4, (S.D.N.Y. June 27, 2019).

Accordingly, each discretionary factor identified by the *Intel* Court weighs in favor of granting the Application.

<u>**CONCLUSION**</u>

WHEREFORE, the Steering Committee respectfully requests this Court enter an Order, substantially in the form submitted herewith:

1.      Granting the Steering Committee's Application for discovery from the Discovery Targets pursuant to 28 U.S.C. § 1782;

2.      Authorizing the Steering Committee to take discovery from the Discovery Targets relating to the issues identified in its Application, including: (a) issuing subpoenas for production of documents by the Discovery Targets in substantially the forms attached to the Application as Exhibits A and B, as applicable; and (b) issuing additional subpoenas for the production of documents as the Steering Committee may reasonably deem appropriate and as are consistent with the Federal Rules of Civil Procedures;

3.      Directing the Discovery Targets to comply with such subpoenas in accordance with the Federal Rules of Civil Procedures and the Rules of this Court;

4.      Appointing the Steering Committee's counsel to issue, sign, and serve such subpoenas upon the Discovery Targets;

5.      Ordering the Steering Committee to deliver copies of the Order and any subpoenas issued pursuant to the Order to Vicentin and its affiliated entities and individuals as set forth on Exhibit B to the Jorge Declaration; and

6.      Granting such other and further relief as is just and proper.


Dated: February 14, 2020
       New York, New York

                                            **NORTON ROSE FULBRIGHT US LLP**

                                            By:    /s/ Thomas J. Hall
                                                   _____
                                                   Thomas J. Hall
                                                   Howard S. Beltzer
                                                   Eric Daucher
                                                   1301 Avenue of the Americas
                                                   New York, New York 10019-6022
                                                   Telephone: (212) 318-3000
                                                   Facsimile: (212) 408-5100
                                                   Email:  thomas.hall@nortonrosefulbright.com
                                                           howard.beltzer@nortonrosefulbright.com
                                                           eric.daucher@nortonrosefulbright.com

                                            *Counsel for the Steering Committee*